No. 22-1718

# In the United States Court of Appeals for the Ninth Circuit

DR. SUNIL AGGARWAL, MD, PHD; ADVANCED INTEGRATIVE MEDICAL SCIENCE INSTITUTE, PLLC,

*Petitioners,*

*v.*

U.S. DRUG ENFORCEMENT ADMINISTRATION; ANNE MILGRAM IN HER OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. DRUG ENFORCEMENT ADMINISTRATION; AND MERRICK GARLAND IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL,

*Respondents.*

**BRIEF OF AMICUS CURIAE KATHY CERMINARA, DAVID N. HOFFMAN, AND JILL SIMONIAN IN SUPPORT OF THE PETITIONERS AND GRANTING THE PETITION**

Sarah A.K. Blitz
Whitney A. Hodges
SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP
333 S. Hope Street, 43rd Floor
Los Angeles, California 90071
213.620.1780
sblitz@sheppardmullin.com
whodges@sheppardmullin.com

Todd. E. Lundell
SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
714.513.5100
tlundell@sheppardmullin.com

Counsel for Amici Curiae

February 15, 2023

SMRH:4887-3496-9422.6
021623

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The Amici Curiae are individuals that do not have a parent corporation or issue stock.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................1

II.     BACKGROUND OF RIGHT TO TRY LAWS .............................................2

III.    PSILOCYBIN IS A SAFE AND EFFECTIVE PALLIATIVE CARE DRUG. ..................................................................4

IV.     DEA'S REFUSAL TO MEANINGFULLY EVALUATE THE RESCHEDULING PETITION VIOLATES ITS STATUTORY OBLIGATIONS UNDER THE CONTROLLED SUBSTANCES ACT ..................................................................6

        A.      History And Intent Of The Controlled Substances Act ......................6

        B.      DEA's Five-Factor Analysis Of "Currently Accepted Medical Use In Treatment" Bears No Connection to the Intent and Text of the CSA ........................................9

V.      DEA'S POSITION DISREGARDS PRINCIPLES OF FEDERALISM AND EFFECTIVELY NULLIFIES STATE RIGHT TO TRY LAWS .......13

VI.     CONCLUSION.........................................................15

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*BFP v. Resolution Trust Corp.*
511 U.S. 531 (1994)..............................................................13

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
467 U.S. 837 (1984)..............................................................9

*Gonzales v. Oregon*
546 U.S. 243 (2006)......................................................6, 8, 13, 14

*Gonzalez v. Raich*
545 U.S. 1 (2005)..............................................................7

*Graves v. Minnesota*
272 U.S. 425 (1926)..............................................................13

*Grinspoon v. DEA*
828 F.2d 881 (1st Cir. 1987)..............................................................9

*Kisor v. Wilkie*
139 S. Ct. 2400 (2019)..............................................................9

*Nat'l Org. for Reform of Marijuana Laws (NORML) v. Ingersoll*
497 F.2d 654 (D.C. Cir. 1974)..............................................................7, 8

*Nebraska v. Parker*
136 S. Ct. 1072 (2016)..............................................................10

*Norml v. DEA*
559 F.2d 735 (D.C. Cir. 1977)..............................................................7

*SAS Institute v. Iancu*
138 S. Ct. 1348 (2018)..............................................................9

*Semler v. Or. State Bd. of Dental Examiners*
294 U.S. 608 (1935)..............................................................13

Statutes

21 U.S.C. § 301 ................................................................................7

21 U.S.C. § 355 ................................................................................3

21 U.S.C. § 360bbb (2018) ................................................................3

21 U.S.C. § 360bbb-0a(b) (2018) ......................................................3

21 U.S.C. § 360bbb-0a § 355 (2018) ................................................3

21 U.S.C. § 811(a)(2) ........................................................................8

21 U.S.C. § 812 ...........................................................................7, 11

21 U.S.C. § 812(a) ..........................................................................11

21 U.S.C. § 812(b)(1)(B) ................................................10, 11, 12, 13

21 U.S.C. § 812(c) ............................................................................8

21 U.S.C. § 826(i)(3)(A) ..................................................................11

21 U.S.C. § 903 ..............................................................................14

Compassionate Access to Medical Cannabis Act, or Ryan's Law ..........................v

Controlled Substances Act ................................................................6

Controlled Substances Act, 21 U.S.C. § 801 ....................................1

Federal Food Drug and Cosmetic Act ........................................7, 10, 14

Federal Narcotic and Dangerous Drug Laws ................................7, 12

Mental Health Law ..........................................................................iii

Science in Health Law ....................................................................iii

Torts, Civil Procedure, and Administrative Law ..............................iii

WASH. REV. CODE ANN. § 69.77 (2017) ............................................2

WASH. REV. CODE ANN. § 69.77.010 (2017) ....................................3

Washington Right to Try Act.................................................................................2

Other Authorities

47 Fed. Reg. 28,141 (June 29, 1982) ................................................................11

53 Fed. Reg. 5,156 (Feb. 22, 1988) ....................................................................9

57 Fed. Reg. 10,499 (Mar. 26, 1992)..................................................................9

57 Fed. Reg. 10,499 at 10,503 ..........................................................................10

57 Fed. Reg. 10,499 at 10,504 (Mar. 26, 1992).................................................9

57 Fed. Reg. 10,499 at 10,504-06 .......................................................................9

12 FDA Drug Bull. 4, 5 (Apr. 1982) .................................................................11

Charles S. Grob et al., *Pilot Study of Psilocybin Treatment for Anxiety
    in Patients with Advanced-Stage Cancer*, 68 ARCHIVES GEN.
    PSYCHIATRY 71, 71 (2011)...............................................................4, 5

Doblin, Richard Elliott, *Regulation of the Medical Use of
    Psychedelics and Marijuana* (Harvard University, June 2000) ..........................2

FDA *Guidance for Industry, Expedited Programs for Serious
    Conditions – Drugs and Biologics* (May 2014),
    https://www.fda.gov/regulatory-information/search-fda-guidance-
    documents/expedited-programs-serious-conditions-drugs-and-
    biologics .................................................................................6

Fed. R. App. P. 29(a)(2) ..................................................................... iii

Goldwater Institute, *Right to Try in Your State*,
    https://righttotry.org/in-your-state/ (last visited May 21, 2021)...........................1

https://www.fda.gov/patients/learn-about-expanded-access-and-other-
    treatment-options/right-try ...................................................................4

Journal of the American Medical Association..........................................................4

Matthew W. Johnson & Roland R. Griffiths, *Potential Therapeutic
    Effects of Psilocybin*...............................................................6

*Resistant Depression* Medscape (Nov. 25, 2019),
 https://www.medscape.com/viewarticle/921789 .................................................6

Roland R. Griffiths et al., *Psilocybin produces substantial and
 sustained decreases in depression and anxiety in patients with life-
 threatening cancer: A randomized double-blind trial,* 30 J.
 PSYCHOPHARMACOLOGY 1181, 1187 (2016) ....................................................5, 6

# IDENTITY AND INTEREST OF AMICI CURIAE[1]

The following individual amici are all distinguished professors who support the rights of terminally ill patients:

- **Professor Kathy Cerminara** is a professor at Nova Southeastern University Shepard Broad College of Law. She is also an affiliate faculty member at NSU's Dr. Kiran C. Patel College of Allopathic Medicine. Professor Cerminara teaches Health Policy & Bioethics, Bioethics and Law and Medicine seminars, Mental Health Law, and other health-law-related courses, in addition to Torts, Civil Procedure, and Administrative Law. She also created and was the initial director of the online Master of Science in Health Law program for non-lawyers. Professor Cerminara bridges the medical and legal professions with her work on patients' rights in the end-of-life decision-making arena. She co-authors the nationally known treatise, *The Right to Die: The Law of End-of-Life Decisionmaking,* and is a reviewer for several medical and medical-legal journals. Her scholarship most recently has focused on the intersection between end-of-life care, palliative care, and health care coverage policy.

---

[1] Under Fed. R. App. P. 29(a)(2), this brief is filed with the consent of all parties. No counsel for any petitioner or respondent authored this brief in whole or part, and no person or entity other than amici, their members, or counsel, made any monetary contribution for the preparation or submission of this brief.

- **Professor David N. Hoffman, J.D.** is an Assistant Professor at Columbia University. Professor Hoffman is also a health care attorney and clinical ethicist and is the Chief Compliance Officer at Carthage Area Hospital, where he supports the clinical and administrative staff in the areas of ethical practice and legal compliance. He has written on a variety of healthcare subjects including use of medical imaging technology in litigation, equal protection rights of physicians, and regulatory responses to the emerging physician shortage, and has served on and advised hospital ethics committees and institutional review boards. He was a member of the faculty of the Montefiore Medical Center/NYU Pilot Certificate Program on Human Research Subject Protection. Professor Hoffman is a volunteer member of the Surrogate Decision-Making Committee of the New York State Department of Health, Commission on Quality of Care/Justice Center. He served as the Chair of the Committee on Bioethical Issues of the Association of the Bar of the City of New York (ABCNY) and as a member of the Committee on Professional Ethics of the New York State Bar Association. Professor Hoffman also chaired the ABCNY Sub-Committee on human transplant organ procurement.

- **Jill Simonian, PharmD**, is currently serving as affiliate faculty at UC San Diego Skaggs School of Pharmacy and UC Irvine School of Pharmacy, as

course chair for "Cannabis Pharmacology and Therapeutics" developed for pharmacy and medical students. After earning her PharmD from UC San Francisco and completing residency training at UC San Diego Medical Center, she served at the Veteran's Administration Medical Center in La Jolla, California as a clinical pharmacist in the inpatient and outpatient settings and worked several years per diem at an independent pharmacy in Carlsbad, California. She is involved with many national organizations collaborating to promote cannabis education to healthcare professionals, in addition to advocating for the standardization of cannabis products and laboratory testing in an effort to best serve the public in a safe manner. She is president of the Pharmacists' Cannabis Coalition of California (PCCC), a non-profit organization focused on cannabis education and advocacy for safe and effective use of cannabis products. PCCC developed Policies and Procedures for healthcare facilities in response to SB 311 (since revised as SB 988), the Compassionate Access to Medical Cannabis Act, or Ryan's Law

## I.  __INTRODUCTION__

Controlled substances hold a special place at the intersection of medicine, law, and society. This brief addresses, from an academic perspective, why research access to investigational drugs, such as psilocybin, ought to be, and is allowed under state and federal law.  The U.S. Drug Enforcement Agency ("DEA") has refused to even consider Petitioner's petition for rescheduling under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (the "CSA" or the "Act"), which is contrary to the CSA's text, structure, history, and purpose; and it departs from the original structure of the statute, because it rests on flawed and outdated case law.

In recent years, the Federal government and a supermajority of states have enacted Right To Try ("RTT") to support patients whose need for care laws, including for end of life care, falls outside of the existing regulatory norms.[2] Pursuant to these laws, many terminally ill patients have benefited from receiving medications and treatment that have not yet been approved by the U.S. Food and Drug Administration ("FDA").[3]  In some cases, terminally ill patients have lengthened their lives and improved the subjective and objective quality of their remaining days.[4]  Psilocybin has a risk profile that is one of the lowest of any

---

[2] Goldwater Institute, *Right to Try in Your State*, https://righttotry.org/in-your-state/ (last visited February 1, 2023).
[3] *See* Goldwater Institute, *Right to Try Is Working*, RIGHT TO TRY, http://righttotry.org/right-to-try-is-working/ (last visited May 19, 2021).
[4] *Id.*

Schedule I drug, and its efficacy as an antidepressant and antianxiety agent have been well established.[5]

In denying Petitioner's rescheduling petition, after encouraging its filing, DEA ended its consideration of the merits of the application before it had even begun, foreclosing researchers, states, physicians, and *Amici* from providing valuable insight based on decades of efforts and investigation addressing the appropriateness of rescheduling psilocybin and ensuring access to it for terminally ill patients.

Consequently, *Amici* urge this Court to vacate DEA's decision and remand to DEA with instructions to comply with its statutory obligation to "gather necessary data" and "request from the Secretary [of the U.S. Department of Health and Human Services ("HHS")] a scientific and medical evaluation, and [her scheduling] recommendations" before deciding whether substantial evidence supports rescheduling.

## II.    BACKGROUND OF RIGHT TO TRY LAWS

In 2017, the state of Washington enacted its RTT law.[6]  The law recognizes that "the process for approval of investigational drugs … often takes many years," and patients with terminal illnesses frequently do not have the luxury of waiting until

---

[5] *See* Doblin, Richard Elliott, *Regulation of the Medical Use of Psychedelics and Marijuana* (Harvard University, June 2000).
[6] WASH. REV. CODE ANN. § 69.77 *et seq.* (2017).

an investigational drug obtains final approval from FDA.[7]  In light of this, Washington legislators unanimously voted to approve access to investigational drugs for "patient[s] with a terminal illness in consultation with the patient's health care provider."[8]

In 2018, following the enactment of the Washington RTT law as well as RTT laws in many other states,[9] the United States Congress enacted a Federal RTT law.[10]  The Federal RTT law carved out a statutory exception to FDA's safety/efficacy requirements for premarket approval under 21 U.S.C. § 355.[11]  The Federal RTT law provides an exemption to Section 355's premarket approval requirements for unapproved investigational drugs that have successfully completed Phase 1 safety trials, but that have not yet completed Phase 2 or 3 trials.  Under specified conditions, this exemption permits prescription of unapproved drugs for therapeutic use by patients facing unnecessary suffering at the end of life, if they who have exhausted approved treatment options.[12]

RTT laws give terminal patients the right to try certain investigational drugs for which safety, though not efficacy, has been established through clinical trials.

---

[7] WASH. REV. CODE ANN. § 69.77.010 (2017).
[8] *Id.*
[9] Goldwater Institute, *supra* note 1.
[10] *See generally* 21 U.S.C. § 360bbb (2018).
[11] 21 U.S.C. § 360bbb-0a (2018).
[12] 21 U.S.C. § 360bbb-0a(b) (2018).

Terminally ill patients who have exhausted approved treatment options face drastically different risk/benefit considerations than other patients.[13]  A supermajority of state lawmakers and the United States Congress have determined that the potential benefits of allowing such patients access to experimental treatment outweighs the risks to them in many situations.  As discussed below, psilocybin addresses a long-standing palliative care gap, promoting individual autonomy and advancing the life-saving and life-enhancing missions of RTT legislation.

## III.   **PSILOCYBIN IS A SAFE AND EFFECTIVE PALLIATIVE CARE DRUG.**

Psilocybin, 4-phosphoryloxy *-N,N-* dimethyltryptamine, is a substance that occurs naturally in various species of mushrooms.[14] In synthetic form, psilocybin has been subjected to a multitude of clinical drug trials. Since the 1960's, clinical studies have shown that critically ill patients treated with psilocybin describe "psychospiritual epiphanies, often with powerful and sustained improvement in mood and anxiety as well as diminished need for narcotic pain medication."[15]

A 2011 pilot study conducted by researchers at the University of California Los Angeles and published in the Journal of the American Medical Association

---

[13] *See* FDA "Right To Try Fact Sheet," https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/right-try.
[14] Charles S. Grob et al., *Pilot Study of Psilocybin Treatment for Anxiety in Patients with Advanced-Stage Cancer*, 68 ARCHIVES GEN. PSYCHIATRY 71, 71 (2011).
[15] *Id.*

"demonstrate[d] that the careful and controlled use of psilocybin may provide an alternative model for the treatment of conditions that are often minimally responsive to conventional therapies, including the profound existential anxiety and despair that often accompany advanced-stage cancers."[16]

In a 2016 randomized double-blind study conducted by researchers at Johns Hopkins University and published in the Journal of Psychopharmacology, "[n]o serious adverse events attributed to psilocybin administration occurred."[17]  The study also found that "psilocybin ([at a dose of] 22 or 30 mg/70 kg) significantly decreases both clinician- and patient-rated measures of depressed mood and anxiety, along with increases in quality of life, life meaning, and optimism, along with decreases in death anxiety."[18] These positive outcomes were produced with a single dose, and they were found to be sustained at a 6-month follow-up, with "about 80% of participants continuing to show clinically significant decreases in depressed mood and anxiety."[19]

These and other studies show that, in research spanning nearly 60 years, psilocybin has been shown to be safe, well tolerated, and effective in reducing

---

[16] *Id.* at 79.

[17] Roland R. Griffiths et al., *Psilocybin produces substantial and sustained decreases in depression and anxiety in patients with life-threatening cancer: A randomized double-blind trial,* 30 J. PSYCHOPHARMACOLOGY 1181, 1187 (2016).

[18] *Id.* at 1181.

[19] *Id.*

clinical depression and anxiety in terminally ill patients.[20] Indeed, in light of the growing body of clinical research supporting the use of psilocybin, in 2018, and again in 2019, FDA designated psilocybin a Breakthrough Therapy.[21] This designation signifies that FDA's review of clinical evidence supports a conclusion that psilocybin can produce substantial improvement on at least one clinically significant parameter over available therapies for at least one serious or life-threatening condition.[22]

## IV. DEA'S REFUSAL TO MEANINGFULLY EVALUATE THE RESCHEDULING PETITION VIOLATES ITS STATUTORY OBLIGATIONS UNDER THE CONTROLLED SUBSTANCES ACT

### A. History And Intent Of The Controlled Substances Act

Congress enacted the CSA in 1970 to combat "drug abuse" and control "the legitimate and illegitimate traffic in controlled substances."[23] The primary feature

---

[20] Matthew W. Johnson & Roland R. Griffiths, *Potential Therapeutic Effects of Psilocybin*, 14 Neurotherapeutics 734, 734 & 739 (2017) (collecting studies); see also Roland R. Griffiths *et al*., *Psilocybin produces substantial and sustained decreases in depression and anxiety in patients with life-threatening cancer: A randomized double-blind trial*, 30 J. of Psychopharm. 1181, 1195 (2016).

[21] *See* Megan Brooks, *FDA Grants Psilocybin Second Breakthrough Therapy Designation for Resistant Depression* Medscape (Nov. 25, 2019), https://www.medscape.com/viewarticle/921789

[22] FDA *Guidance for Industry, Expedited Programs for Serious Conditions – Drugs and Biologics* (May 2014), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/expedited-programs-serious-conditions-drugs-and-biologics.

[23] *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006).

of the CSA is the scheduling system.[24] Drugs are classified into five schedules based on based on their accepted medical uses, potential for abuse, and effects on the body.[25] Schedule I contains drugs are defined as "drugs with no currently accepted medical use and a high potential for abuse"[26] Schedules II through V rank others from most to least dangerous based on relative potential for abuse and dependence.[27] Controls and penalties align with a drug's scheduling—the lower the schedule number the more restrictive the controls and the more severe the penalties for violations.[28]

Notably, schedules exist apart from the Food and Drug Administration's ("FDA") regulations governing the approval of new drugs for interstate marketing under the Federal Food Drug and Cosmetic Act ("FDCA").[29] Non-FDA-approved drugs may not be marketed interstate under the FDCA regardless of their placement on the CSA's schedules.[30] Moving a drug to a higher number schedule (for example,

---

[24] *See* 21 U.S.C. § 812; *Nat'l Org. for Reform of Marijuana Laws (NORML) v. Ingersoll*, 497 F.2d 654, 656 (D.C. Cir. 1974).

[25] *Raich*, 545 U.S. at 13.

[26] *See* 21 U.S.C. § 812.

[27] *See* 21 U.S.C. § 812; *see also* Michael Sonnenreich et al., Handbook of Federal Narcotic and Dangerous Drug Laws, Dep't of Justice (Jan. 1969), at 26-27, 73-74 (hereafter "Handbook of Federal Narcotic and Dangerous Drug Laws").

[28] *NORML v. DEA*, 559 F.2d 735, 737 (D.C. Cir. 1977).

[29] *See* 21 U.S.C. § 301 *et seq*.

[30] *See id*. § 331.

from Schedule I to Schedule III) does not approve it for interstate marketing, but it may remove some additional regulatory barriers.

Congress made the initial scheduling decisions under the CSA, 21 U.S.C. § 812(c), and provided an administrative procedure for future scheduling and rescheduling. Under § 811(a)(2), the transfer of a drug between schedules may be initiated by the Attorney General "(1) on his own motion, (2) at the request of the Secretary, or (3) on the petition of any interested party." "Congress contemplated that the classification set forth in the [CSA] as originally passed would be subject to continuing review by the executive officials."[31]

Notably, and as discussed in greater detail *infra*, Congress legislated the CSA against the backdrop of federalism.[32]  As such, the CSA "presume[s] and relies upon a functioning medical profession regulated under the States' police powers," prohibits the federal government from making "anterior judgment[s]" about what constitutes accepted medicine or medical treatment, and "manifests no intent to regulate the practice of medicine generally."[33]

---

[31] *NORML, supra,*, 497 F.2d at 656.
[32] *See Oregon*, 546 U.S. at 270.
[33] *Id.* at 270, 272.

**B.** **DEA's Five-Factor Analysis Of "Currently Accepted Medical Use In Treatment" Bears No Connection to the Intent and Text of the CSA**

Soon after the Supreme Court's decision in *Chevron*[34] ushered in a new era of judicial deference to agency interpretations of statutes,[35] DEA promoted a novel interpretation of "no currently accepted medical use in treatment in the United States" justified by a string of circuitous judicial and administrative proceedings.[36] DEA's 1992 Rule, 57 Fed. Reg. 10,499 (Mar. 26, 1992), setting forth its five-factor test for "currently accepted medical use in treatment" requires that:

1) The drug's chemistry is known and reproducible;
2) There are adequate safety studies;
3) There are adequate and well-controlled studies showing efficacy;
4) The drug is accepted by qualified experts; and
5) The scientific evidence is widely available.[37]

---

[34] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[35] Notably, a host of post-*Chevron* decisions have significantly reined in judicial deference to agency interpretations such as DEA's effective re-write of the CSA via its five-factor test. *See, e.g., Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991)); *see also SAS Institute v. Iancu*, 138 S. Ct. 1348, 1359 (2018) ("Even under *Chevron*, we owe an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' we find ourselves unable to discern Congress's meaning.").

[36] *See, e.g. Grinspoon v. DEA*, 828 F.2d 881, 884 (1st Cir. 1987) (First Circuit denied DEA's interpretation of a lack of FDA approval for interstate marketing to be the equivalent of "no currently accepted medical use"); 53 Fed. Reg. 5,156 (Feb. 22, 1988) (DEA pronouncing an eight-factor analysis for "characteristics of a drug or other substance with an accepted medical use"); 57 Fed. Reg. 10,499 at 10,504 (Mar. 26, 1992) (setting forth a revised five-factor test).

[37] 57 Fed. Reg. 10,499 at 10,504-06.

The 1992 Rule posits that Congress intended the FDCA standards to serve as evidence of what drugs Congress considered "acceptable for medical" use under Section 812(b)(1)(B).[38] However by focusing on what DEA believes is "acceptable" instead of what the medical profession has, in fact, already "accepted," DEA's interpretation ignores the plain text of Section 812(b)(1)(B).[39] Further, Section 812(b)(1)(B)'s reference to what is occurring "in treatment," calls for a determination focused on how physicians actually use drugs to treat patients. DEA's five-factor analysis ignores the actual practice of medicine. The 1992 Rule underscores the point, declaring "impressions of physicians" and "[t]he observations and opinions of medical practitioners who are not experts in evaluating drugs" irrelevant under Section 812(b)(1)(B).[40] Under the 1992 Rule, the DEA argues that "the core standards developed under the FDCA represent a long-term consensus of expert medical and scientific opinion concerning when a drug should be accepted by anyone as safe and effective for medical use."[41] This assertion ignores the widespread "off label" use of drugs by practicing clinicians and the implementation of compassionate use exemptions and RTT laws. In fact, however, FDA has

---

[38] 57 Fed. Reg. 10,499 at 10,503.

[39] *See Nebraska v. Parker*, 136 S. Ct. 1072, 1078 (2016) (statutory interpretation begins with the language of the statute itself).

[40] 57 Fed. Reg. 10,499 at 10,505 ("[T]he only body that counts is that of the experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs.").

[41] 57 Fed. Reg. 10,499 at 10,503.

recognized that drugs can "obtain accepted medical use" for purposes of Section 812(b)(1)(B) "by virtue of totally intrastate production and use" and that drugs can become accepted for use in treatment without FDA approval.[42]

Moreover, Section 812(b)(1)(B)'s focus on currently accepted medical use, as opposed to FDA approval, reflects the Congress's intent in establishing a framework nimble enough to change with evolving science. A "currently accepted medical use," distinguishes today's accepted medical uses from yesterday's or tomorrow's uses. Recognizing that the practice of medicine is always progressing, Congress tied federal drug control to the present medical community and up-to-date science. To that end, it also demanded that "the schedules established by [Section 812] be updated and republished on a semiannual basis during the two-year period beginning one year after October 27, 1970, and … on an annual basis thereafter."[43]

Likewise, Section 826(i)(3)(A) requires the Attorney General to "submit to Congress a report" on how he will "take into consideration changes in the accepted medical use of the covered controlled substances" when "fixing and adjusting production and manufacturing quotas under this section for covered controlled substances." Thus, the CSA anticipates an agency focus on the ever-evolving

---

[42] 47 Fed. Reg. 28,141 (June 29, 1982); 12 FDA Drug Bull. 4, 5 (Apr. 1982).
[43] 21 U.S.C. § 812(a).

SMRH:4887-3496-9422.6
021623

consensus of medical opinion, which is ready to adjust the schedules annually to ensure federal law keeps pace with the practice of medicine.[44]

Since its pronouncement in 1992, DEA has utilized its five-factor test to stymie efforts to reschedule drugs used under RTT laws such as MDMA, cannabis, and psilocybin. For instance here, DEA's letter of denial to Petitioner cites the "five-part test" for "currently accepted medical use" and contends that: "[a] prerequisite to transferring a substance from schedule I to schedule II is for FDA to determine whether a drug has a currently accepted medical use in the United States."[45] That is simply not the FDA's function and is, in fact an impossibility. A drug cannot have a "currently accepted use" if doctors are not allowed to use it. This is, essentially, a Catch-22.

The denial then states that psilocybin must remain in schedule I because "FDA has not articulated any accepted medical use for psilocybin in treatment."[46] Rather than effectuate the CSA's purposes, DEA's illogical approach renders it blind to current evidence of medical practice and significant clinical research. Given this tunnel vision, Section 812(b)(1)(B) no longer measures "currently accepted medical use" at all. It measures only whether another federal agency has or would approve

---

[44] *Handbook of Federal Narcotic and Dangerous Drug Laws* at 26-29 (discussing flexibility and adjustability of schedules).
[45] DEA Denial Letter to Petitioner, dated September 23, 2022.
[46] *Id*.

a drug for interstate marketing under a different statute. DEA's contorted textual statutory interpretation ensures that research and medical advancements surrounding Schedule I substances — even in the RTT context and even with "Breakthrough Therapy" status — will continue to be denied rescheduling, in contravention of the CSA's plain intent and text. Such a result cannot be left to stand.

## V.   DEA'S POSITION DISREGARDS PRINCIPLES OF FEDERALISM AND EFFECTIVELY NULLIFIES STATE RIGHT TO TRY LAWS

Traditionally, "the State is primarily the judge of regulations required in the interest of public safety and welfare," particularly in medicine.[47] The federalism canon of construction requires courts to avoid interpretations of federal law that would upset the traditional state-federal balance absent a clear indication that Congress intended otherwise.[48] As the decision in *Oregon* explained, proper interpretation of the CSA requires keeping federalism principles and the States' traditional authority to regulate the medical profession squarely in view.[49]

Indeed, by tethering Section 812(b)(1)(B) to findings about what is currently accepted medical treatment and <u>not</u> what the Attorney General or FDA deems

---

[47] *Graves v. Minnesota*, 272 U.S. 425, 428 (1926); s*ee also Semler v. Or. State Bd. of Dental Examiners*, 294 U.S. 608, 611 (1935) (holding that the state may regulate the practice of dentistry by prescribing the qualifications that are reasonably necessary).

[48] *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 539 (1994) ("Absent a clear statutory requirement to the contrary, we must assume the validity of this state-law regulatory background and take due account of its effect.").

[49] *See Oregon*, 546 U.S. at 270-275.

acceptable, Congress demanded a fact-based inquiry focused on what states' medical professionals have, in fact, accepted – not what practicing chief law enforcement officer believes they should have accepted. In so doing, Congress sought to preserve traditional state authority over the practice of medicine.[50] By focusing on an FDCA-centric standard designed to assess whether drugs are sufficiently safe and effective to be deemed acceptable for interstate marketing, DEA upends the federal-state balance created by Congress to balance determinations of safety and necessity.[51]

When states adopted RTT laws, they intended to promote individual bodily autonomy. These state laws provide that terminal patients and their doctors should be free to choose—without government interference—whether a patient's treatment should include non-FDA-approved medications, such as psilocybin. As discussed above, researchers and physicians have shown through clinical trials that psilocybin can have appropriate medical applications in restricted use settings under RTT laws and compassionate use regulation.

DEA's refusal to accommodate access to psilocybin under RTT, let alone open an scientific review related to a rescheduling petition, not only undermines congressional goals, but also exceeds its authority. The FDCA and RTT laws were

---

[50] *See Oregon*, 546 U.S. at 270 ("The structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States' police powers."). *See also* 21 U.S.C. § 903 (anti-preemption provision).
[51] *Id.*

created to protect the life and health of the public from dangerous and ineffective medications. But as was learned during the early days of the HIV/AIDS when those legal protections only produce suffering and death they serve no legitimate legal and public health purpose. Sometimes government can do best for its citizens by simply stepping out of the way.

## VI.    CONCLUSION

Based on the statutory text, structure, history, purpose—and the original understanding the statute—"currently accepted medical use" means "legitimate" or "lawful medical purpose."  This is the only interpretation that captures the CSA's vision of cooperative federalism and respects state sovereignty.  Under it, Petitioner and the larger medical, scientific and legal community have put forth compelling evidence that precludes a finding that psilocybin has "no currently accepted medical

///

///

///

SMRH:4887-3496-9422.6
021623

use in treatment in the United States." For all of the foregoing reasons, the Court should grant the relief requested in Petitioners' Brief.

Dated: February 15, 2023

Respectfully submitted,

By: /s/ *Todd E. Lundell*

Sarah A.K. Blitz
Whitney A. Hodges
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
333 S. Hope Street, 43rd Floor
Los Angeles, California90071
213.620.1780
sblitz@sheppardmullin.com
whodges@sheppardmullin.com

Todd E. Lundell
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
714.513.5100
tlundell@sheppardmullin.com

Counsel for Amici Curiae

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because this brief contains 3,341 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

*/s/ Todd E. Lundell*